.IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs March 26, 2013

**STATE OF TENNESSEE v. RAY A. TULLOS**

**Direct Appeal from the Circuit Court for Bledsoe County**
**No. 2009-CR-10    Buddy D. Perry, Judge**

**No. E2012-01634-CCA-R3-CD - Filed September 27, 2013**

A Bledsoe County Circuit Court Jury convicted the appellant, Ray A. Tullos, of attempted second degree murder. The trial court sentenced the appellant to eleven years in the Tennessee Department of Correction. On appeal, the appellant challenges the trial court's evidentiary rulings, the sufficiency of the evidence sustaining his conviction, and the sentence imposed. Upon review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which THOMAS T. WOODALL and ROBERT W. WEDEMEYER, JJ., joined.

M. Keith Davis (at trial and on appeal), Dunlap, Tennessee, and Paul Cross (at trial), Monteagle, Tennessee, for the appellant, Ray A. Tullos.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Senior Counsel; J. Michael Taylor, District Attorney General; and James W. Pope, III, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

The appellant and his three co-defendants, Preston Parker, Lonnie Angel, Jr.,[1] and Clinton Watson, were indicted for the first degree premeditated murder, felony murder, and

---

[1]Some of the witnesses in this case share a surname. Therefore, for clarity, we have chosen to utilize their first names, and, in the case of Lonnie, Jr., and Lonnie, Sr., we will also utilize the appropriate suffix. We mean no disrespect to these individuals.

especially aggravated kidnapping of the victim, Donnie Lawson.  Before trial, Parker pled guilty to second degree murder, and the appellant's case was severed from that of his remaining co-defendants.[2]

At trial, Preston Parker testified that in the late afternoon of February 21, 2009, he; his girlfriend, Evalee Holloway; his son, P.J. Parker; and his nephew, Dalton Parker, attended a cookout at Lonnie, Jr.'s barn on Norwood Road.  The barn was located 100 to 150 yards from Lonnie, Jr.'s mobile home.  When Preston and his family arrived, Lonnie, Jr., and the victim were already at the barn, and their trucks were parked nearby.  Lonnie, Sr., was passed out in the victim's truck.  The men drank beer and grilled deer meat.

Preston said that about thirty minutes to an hour later, while Lonnie, Jr., and Watson were present, he asked the victim if he had killed Clyde Angel, who was Lonnie, Sr.'s brother. Clyde died in a house fire in February 2009.  Lonnie, Sr., and the victim were at the house at the time of the fire.  The victim approached Preston, saying, "'What if I did?'" Preston grabbed the victim's beard, pulled it, and hit the victim with his left hand, knocking him to the ground. Preston said that his left hand was disabled and in a cast.  Preston kicked the victim once or twice in the head, which rendered him unconscious.  Lonnie, Jr., and Watson were present during the altercation.  Watson kicked the victim twice as the victim lay on the ground.

Preston said that approximately ten minutes after the altercation, the appellant and Mark Sherman arrived.  The victim was on the ground, moving a little and bleeding from the nose. The appellant asked what had happened.  Preston replied that he and the victim had fought because the victim "supposedly . . . burnt Clyde Angel up."  The appellant, who had been friends with Clyde, "flipped out," struck the victim twice with a wine bottle, grabbed a "posthole driver," and swung it toward the victim.  Preston did not see if the post hole driver hit the victim.  The appellant also kicked the victim in the stomach and hit the victim in the head twice with a pair of rubber boots that he had taken from Lonnie, Jr.'s truck. Lonnie, Jr., also kicked the victim.

Preston said that the attack lasted "off and on" for fifteen to twenty minutes.  The victim tried to get up once, and Preston kicked him in the head.  Lonnie, Jr., had a gun and was preparing to the shoot the victim when Lonnie, Sr., came into the barn and told everyone to stop.  Lonnie, Sr., said that the victim had not done anything.  The victim's face and head were bleeding.  Preston, Lonnie, Jr., Watson, and the appellant discussed taking the victim's body "to the rock crusher."  However, Lonnie, Sr., stopped them and said he was going to

_____

[2]The record reflects that Lonnie, Jr., was convicted of second degree murder.  The record does not reflect the disposition of the case against Watson.

-2-

call an ambulance. Sherman and Lonnie, Sr., left to make the call. Shortly thereafter, Preston, Watson, and the appellant heard police sirens and fled. Preston said that when he left the barn, the victim was alive but was having trouble breathing.

Preston acknowledged that he pled guilty to second degree murder for his role in the victim's death. Preston said that he never saw anyone urinate on the victim, but the appellant told Preston that the appellant urinated on the victim.

On cross-examination, Preston said that earlier in the day, he had taken P.J. and Dalton to a "chicken fight." Preston met Lonnie, Jr., at the fight. Preston stated that Lonnie, Jr., was a large man, approximately six feet, seven inches tall. Preston said that the victim "was a pretty good size fellow, too."

Preston clarified that he was left-handed; that his cast was on his right arm, not his left; and that he did not recall whether he was wearing the cast on the day of the offense. Preston said that his "first punch" rendered the victim unconscious. He did not want the victim to be able to get up because the victim was "a dangerous man." Preston acknowledged that he "kicked the hell out of" the victim and that he kicked him approximately seven times.

Preston said that Lonnie, Jr., had a gun and did not want anyone to leave after Preston first hit the victim. When the appellant and Sherman arrived, the victim was lying on the ground. The victim roused, and Watson cautioned Preston that the victim was trying to get up. Preston kicked the victim in the head about three times and punched him until he lost consciousness.

Preston acknowledged that when he initially spoke with Agent Mark Wilson, he tried to minimize the number of times he struck the victim. Preston maintained that he could not recall specifically how many times he struck the victim. He conceded that his initial statements to Agent Wilson about what transpired after the beating were untrue.

On redirect examination, Preston said that when the appellant arrived, the victim "was on the ground pretty much out of it" and was not a threat to anyone. Preston did not see anyone tell the appellant to strike the victim.

William Mark Sherman testified that he was fifty years old and unemployed. He had known the appellant all of the appellant's life. Around 2:00 p.m. on February 21, 2009, the appellant came to Sherman's house, and over the course of two or three hours, they drank a six-pack of beer and some whiskey. Eventually, they drove to a Jiffy Mart convenience store to purchase more beer. After leaving the store, Sherman drove them to a friend's house

-3-

where they drank more beer. As they left the friend's home, they decided to go to Lonnie, Jr.'s house to visit.

Sherman said that they arrived at Lonnie, Jr.'s residence around 8:00 or 8:30 p.m. There was no activity at the mobile home, so Sherman drove to the barn. Inside the barn, Sherman saw Lonnie, Jr., Watson, and Preston. The victim was lying on the ground, was bleeding, and had lacerations on his face. His breathing was "hoarse." Sherman said that the victim was not a threat to anyone.

Sherman and the appellant were told that the victim was responsible for killing Clyde Angel. The appellant looked around, picked up a wooden stick, and approached the victim. Sherman disarmed the appellant and told him to calm down. Sherman then went behind the barn to relieve himself, and when he returned, the appellant was approaching the victim with a "small, probably three-eighths inch piece of like rebar," which might have been a "flower arrangement stand." When the appellant was about seven feet from the victim, the appellant raised the object above his head, preparing to strike the victim. Once again, Sherman intervened and disarmed the appellant. The appellant picked up a "concrete boot, . . . a green dairy boot" and threw it at the victim. Sherman could not see if the boot struck the victim. Sherman said that no one was forcing the appellant to do anything or preventing the appellant from leaving.

Sherman said that he and the appellant went behind the barn and then separated. When Sherman heard a commotion, he went back inside the barn. Lonnie, Sr., came inside and said to leave the victim alone because he was not responsible for Clyde's death. Lonnie, Sr., told Sherman that he would call an ambulance.

Sherman said that he heard sirens when he left Lonnie, Sr., at his sister's house. Sherman returned to the barn and noticed fresh blood on the victim.

On cross-examination, Sherman stated that Lonnie, Jr., was a "pretty good size fellow." Sherman agreed that the appellant "snapped" after hearing that the victim had killed the appellant's friend. Sherman saw Watson, who had a gun, kick the victim on the leg. Preston kicked the victim two or three times and stomped on the victim's face. Sherman never saw the appellant hit the victim with a beer bottle.

Lonnie Angel, Sr., testified that he was fifty-two years old and that Lonnie, Jr., was thirty-two years old. Lonnie, Sr., said that although the victim was his "double first cousin," the victim was "[m]ore like a brother." Several months prior to February 2009, a fire occurred at Lonnie, Sr.'s house, during which his brother, Clyde, lost his life. Lonnie, Sr., the victim, and several other family members were also at the house at the time of the fire.

The cause of the fire was never determined. Lonnie, Sr., said the victim was not responsible for the fire.

Lonnie, Sr., said that on February 21, 2009, he went to a rooster fight with his son, Timmy, and then they went to get beer. Afterward, Lonnie, Sr., drove to the victim's house. Lonnie, Sr., stayed with the victim to help him put air in a tire and sent Timmy back to the rooster fight. Once the tire was repaired, the victim and Lonnie, Sr., went to the rooster fight. Thereafter, they stopped at a store for more beer and kerosene before going to Lonnie, Jr.'s barn to attend a cookout.

Lonnie, Sr., said that when they arrived at Lonnie, Jr.'s barn, Lonnie, Jr., Watson, and Preston were there. The victim went into the barn, and Lonnie, Sr., took a nap in the victim's truck. When Lonnie, Sr., woke, he went into the barn and noticed that the appellant and Sherman had arrived. Lonnie, Sr., saw the victim lying on the ground near the tailgate of Lonnie, Jr.'s truck. The victim was bleeding, was not moving, and was in "[p]retty bad shape." Lonnie, Sr., asked what was happening, and someone responded that the victim had killed Clyde. Lonnie, Sr., told the men to leave the victim alone. The appellant had a "post-driver" and said, "'Let's do him in.'" Lonnie, Sr., responded, "'You're crazy as H-E-L-L.' . . . [H]e was whooped inside the barn." Lonnie, Sr., did not see anyone else with a weapon. According to Lonnie, Sr., the appellant and Preston kicked the victim while he was lying on the ground. When Lonnie, Sr., left the barn, the victim was alive and lying on the ground. Lonnie, Sr., called 911. Lonnie, Sr., said that the victim never attempted to stand up and was not a threat to anyone.

On cross-examination, Lonnie, Sr., said that the morning after the attack, he told Agent Wilson that he was an alcoholic, had been drinking that night, and had taken a lot of medication. Lonnie, Sr., saw Preston kick the victim once or twice. Lonnie, Sr., never saw the appellant hit the victim and never saw anyone hit the victim with a bottle. Preston tried to urinate on the victim, but Lonnie, Sr., pushed him away before he could accomplish the act.

Tennessee Bureau of Investigation (TBI) Special Agent Criminal Investigator Mark Wilson testified that on February 21, 2009, he assisted the Bledsoe County Sheriff's Department in the investigation of the victim's death. Agent Wilson went to Erlanger Hospital and learned that the victim had died. The victim had injuries to his face, cranial area, torso, and stomach. Agent Wilson arranged for the body to be transported to the medical examiner's office for an autopsy. Later, Agent Wilson went to the crime scene and collected evidence. At the scene, he found a post hole driver and a 32-ounce King Cobra bottle, both of which appeared to have blood on them. On the rear bumper of Lonnie, Jr.'s truck, he saw dark spots that appeared to be blood and took a swab of the spots. He also

collected a rubber boot from the back of Lonnie, Jr.'s truck. The boot appeared to have blood on it. Additionally, he obtained a sample of the victim's blood and buccal swabs from Preston, the appellant, and Watson. Agent Wilson sent the blood sample, boot, swabs, bottle, and post hole driver to the TBI crime laboratory for testing.

Agent Wilson said that on the morning of February 22, 2009, he interviewed the appellant at the Bledsoe County Sheriff's Office. Investigator Ricky Seals and Sheriff Jimmy Morris were also present for the interview. After being advised of his Miranda rights, the appellant agreed to give a recorded statement. Agent Wilson read the statement to the jury. During the interview, the appellant said that he drank alcohol before going to Sherman's house and that he drank more alcohol at Sherman's house. The appellant and Sherman left to visit a friend and then went "riding around." The appellant suggested that they go visit Lonnie, Jr. When they arrived around 9:00 or 10:00 p.m., the appellant saw Lonnie, Sr., sitting in a truck but did not see Lonnie, Jr. The appellant heard people talking and went into the barn where he saw the victim lying on the ground behind a blue truck. The appellant approached the victim, whom he did not know. The appellant and Sherman asked what was happening. Preston said that he had "knocked [the victim] out." The appellant noticed the victim had blood on his face, but he was not dead. Preston kicked the victim a few times. After the kicks, the victim was still moving. The appellant went behind the barn to relieve himself and heard Lonnie, Sr., say, "Don't kick him no more." The appellant saw the victim try to get up, and Preston kicked him to the ground. Preston was the only person the appellant saw strike the victim, but he did not hit him with a weapon. The appellant said he was drunk and picked up a pipe to hit the victim, but Lonnie, Sr., told him to stop. The appellant said, "[H]ell, I'm going to go ahead and hit." Lonnie, Sr., told the appellant that he was going to leave the barn and call the police. Preston and Lonnie, Jr., said that "they was going to finish him like that but I don't think he meant to hurt him [or kill him]." The appellant said that he and Sherman did not intend to let anyone "take [the victim] off and kill him because he was still alive." The appellant acknowledged that he did not tell the men not to hit the victim, explaining that "it wouldn't have done no good. They might have knocked the hell out of me." When the appellant left the barn with Lonnie, Jr., the victim was still alive. Approximately ten minutes later, the police arrived, and the appellant and Sherman fled. Near the end of the interview, the appellant said that he kicked the victim because "[t]hey said he was sorry as sh[*]t. We's drunk. We's just a bunch of drunks out there. I had been drinking a little moonshine. But I never kicked him in his face or head and he wasn't dead when we left."

On cross-examination, Agent Wilson said that he interviewed numerous witnesses in addition to the appellant, including Lonnie, Sr., Preston, Watson, and Sherman. Agent Wilson could not definitively say that any of the victim's wounds were caused by the rubber boot. Agent Wilson acknowledged that Preston told him that the appellant had urinated on

-6-

the victim. Preston did not implicate anyone else in the assault until late in the interview.

Suzanne Lafferty of the TBI crime laboratory testified that she was unable to find any fingerprints on the post hole driver or the boot. She found one fingerprint on the bottle but was unable to match it to any of the suspects.

Mark Dunlap, a special agent forensic scientist with the Serology and DNA Unit of the TBI Crime Laboratory, testified that the victim's blood was on the boot, the post hole driver, the bottle, and the swab from the truck bumper. Although he tested the bottle for saliva, he was unable to discern the identity of the person who drank from the bottle.

Evalee Cleo Holloway testified that on February 21, 2009, she was dating Preston, and that they, P.J., and Dalton went to Lonnie, Jr.'s barn. When they arrived, she saw the victim, Lonnie, Jr., and Lonnie, Sr. Holloway went to the mobile home to prepare food while Lonnie, Jr., grilled deer steaks. Elaine Angel, Lonnie, Jr.'s wife, was at work, so only the children were at the house.

Holloway stated that at some point that evening, the children went to the barn. When they returned to the mobile home, they told her there was a problem in the barn. Holloway began walking toward the barn to investigate, but Preston ordered her to return to the house. Later, the appellant, Preston, and Watson came to the house to eat. However, when they heard police sirens, they ran out the back door. Holloway went to the barn when the ambulance arrived and saw the victim lying on the ground, noting he had been "beat[en] so bad" that it was difficult to recognize him. The victim tried to talk to Holloway but "gurgl[ed] on his own blood."

On cross-examination, Holloway said that she had been to the chicken fight with Preston earlier that day. Preston took off his cast and left it in her vehicle.

Twelve-year-old Dalton Parker testified that in February 2009, he went with his uncle, Preston; Holloway; and P.J. to Lonnie, Jr.'s residence for a cookout. After they arrived, Dalton, Christopher, Kelvin, and P.J. went to the loft of the barn, looked down, and saw Lonnie, Jr., Preston, Watson, the victim, and the appellant. Someone started talking about how Clyde died. Preston grabbed the victim's beard, pulled his head down, and punched and kicked him repeatedly. The appellant hit the victim "with a post thing" and with a beer bottle. Dalton saw Lonnie, Jr., with a gun and heard him say that he intended to shoot the victim and "put him in the ground." Someone told the children to go to the mobile home, and they complied. Thereafter, the police arrived.

On cross-examination, Dalton said that he loved Preston and that Preston had told him

"about the boots." He stated that Preston did not beat the victim "badly" and that Preston was wearing his cast when he struck the victim.

Mitchell Rice, an EMT, testified that on February 21, 2009, he, Paul Putnam, and Ryan Angel responded to a call for an ambulance at Lonnie, Jr.'s barn. Rice went into the barn and saw the victim lying on the dirt. The victim was alive but unresponsive. He had a large knot on the back of his head, and a large amount of blood was around his head and coming out of his nose and ears. The victim was having trouble breathing, was unable to speak, and was "gargling" blood or fluid in his throat. Rice opined that the blood was coming from the victim's head injuries. The EMTs put the victim into the ambulance and tried to keep his airway open as they transported him to the hospital. However, on the way, the victim stopped breathing, and the EMTs began performing cardiopulmonary resuscitation (CPR). They continued trying to resuscitate the victim as they took him into the hospital but stopped approximately fifteen to thirty minutes later when a doctor pronounced the victim dead.

Dr. Amy R. McMaster, a forensic pathologist who performed the victim's autopsy, testified that the victim was five feet, nine inches tall and weighed 220 pounds. He had several blunt force injuries on his head; abrasions and scratches on his scalp; and a cut to the right eyebrow. Both of the victim's eyes were black and blue; there were abrasions on his cheek; his upper lip was bruised and swollen; his right jaw was fractured; he had scratches, bruises, and a cut behind his right ear; and he had a bruise on his left flank above his hip but below his ribcage. During her internal examination, Dr. McMaster found bleeding on both sides of the victim's scalp in the temple area. His brain was swollen, and he had bleeding on both sides of his brain. However, his skull was not fractured. The victim's blood alcohol content was .124. Dr. McMaster concluded that the victim's death was caused by blunt force trauma to the head. Dr. McMaster stated that no single blow killed the victim but that his death was from the cumulative, concussive effect of all of the blows. She stated that the victim's injuries could have been caused by boots, a beer bottle, or a metal pipe but also stated that the injuries could have been caused by "none of those."

On cross-examination, Dr. McMaster said that if the appellant had hit the victim's skull "full force" with a metal object, the blow would likely have fractured the victim's skull. However, a glancing blow might not have fractured the skull.

The State rested its case-in-chief. Defense counsel made a motion for judgment of acquittal, which the trial court granted as to the felony murder and aggravated kidnapping charges.

The first defense witness, Dr. David Solovey, a clinical psychologist with a Ph.D. in

psychology, testified that he had examined the forty-nine-year-old appellant and reviewed the appellant's medical records. From the records, Dr. Solovey learned that in 1997, the appellant was hospitalized for major depression with psychotic features, bipolar disorder, and anxiety or panic disorder without agoraphobia. Since that diagnosis, the appellant had been continuously treated and was taking citalopram, Seroquel, and clonazepam for anxiety and depression. The appellant had maintained employment throughout most of his adult life and was a father.

Dr. Solovey said that he administered psychological tests to the appellant, which revealed that he was competent to stand trial and that he had an I.Q. of 66, which fell within the level of mild mental retardation. He saw no indication that the appellant was malingering. Dr. Solovey stated that, typically, someone with the appellant's symptoms could live a mostly normal life.

Dr. Solovey stated that the appellant was "pretty low functioning" and that "his own personal resources for determining how to behave are not real strong." Regarding the appellant's actions in the attack, Dr. Solovey opined that the appellant likely panicked and did not respond in a clear and organized manner due to the stress of the situation and his alcohol consumption. He stated that the appellant was a follower "who would be part of a group rather than strike out or do things that would require individual decisions." He also concluded that the appellant was "not very internally cohesive, and his ability to handle unusual or stressful situations is pretty weak anyway, so the effect would be disorganized, and you know, somewhat unclear erratic behavior."

On cross-examination, Dr. Solovey acknowledged that individuals with the same I.Q. as the appellant could function in society and maintain employment. The appellant had served in the military, received an honorable discharge, and held several different types of "[b]lue collar" jobs. The appellant married his wife approximately eighteen months prior to trial, but they had been together for twenty years and had a nineteen-year-old son. Dr. Solovey believed the appellant was on medication for anxiety and depression in February 2009. However, on the date of the offense, the appellant also had consumed alcohol, which had an unpredictable effect when combined with the medication. Dr. Solovey's report reflected that the appellant was suspicious and distrustful of people and that he was wary and alert to potential insults.

Randy Sharp testified that he and the appellant grew up together and that they lived next door to each other as children. Sharp attended school with the appellant and knew the appellant was assigned to special education and vocational classes. Sharp said that when they were children, the appellant was nicknamed "Slobbers and Slobber-box" because he "slobbered uncontrollably."

Sharp said that about three years before the appellant's trial, he, the appellant, and others went camping. As they began bedding down for the night, the appellant had a panic attack and started "trying to ram his head out anywhere he could see daylight to get out of his tent, and was just hollering and screaming and crying." Sharp was disturbed by the appellant's actions but was able to calm him after five or ten minutes. Afterward, the appellant started crying. Sharp said that the episode was the most severe breakdown he had seen the appellant have but noted that during childhood sleepovers, the appellant had nightmares and woke up yelling. Sharp believed the appellant's "spells" occurred randomly. He thought the appellant had been taking medication for the past ten years.

On cross-examination, Sharp acknowledged that the appellant had passed all of his classes and had graduated. Sharp agreed that the appellant was "a pretty easy going fellow." When asked "if it was a different story" when the appellant was mad, Sharp responded, "Well, it all depends."

Virgil Eller testified that he was in a relationship with Margaret Lackey, Watson's sister. On February 21, 2009, he was at Lonnie, Jr.'s barn with Watson. Also present were the victim, Lonnie, Sr., and Preston. At first, the men stood around talking and eating. As the victim was walking out the door to leave, Preston hit him on the back of the head. The victim had not moved toward Preston prior to being hit. Preston hit the victim several times on the head. The victim fell to the ground, and Preston repeatedly kicked and stomped his head. Preston was wearing a pair of steel-toed work boots. The victim never got up. Eller said that the appellant and Sherman were not present and that Lonnie, Jr., did not join in the attack. Eller said that he just stood still because he was afraid and did not know what to do.

Eller stated that he had to get "clearance" from Lonnie, Jr., to leave, explaining that it took him and Watson fifteen minutes to persuade Lonnie, Jr., to allow Eller to leave the barn to pick Lackey up at work. Eller left in Watson's truck. As he left, he saw a silver and maroon Blazer approaching the barn. Eller did not call the police after he left.

On cross-examination, Eller stated that he and Watson had been drinking beer that day. He left the barn at approximately 8:20 p.m. He said that "they" would not let Watson leave with him. Eller acknowledged that he had lied to police and told them that he had not been at Lonnie, Jr.'s on the night in question and that he did not know anything about the incident, explaining that he was scared.

At the conclusion of the proof, the jury found the appellant guilty of attempted second degree murder, for which the trial court imposed a sentence of eleven years. On appeal, the appellant challenges the trial court's evidentiary rulings, the sufficiency of the evidence, and the sentence imposed.

## II. Analysis

### A. Evidentiary Rulings

The appellant argues that the trial court "abused its discretion when it allowed the State to improperly elicit testimony about [the appellant's] character . . . [and that] the trial court erred when it refused to allow him to introduce evidence of his co-defendants' propensity for violence." The State contends that the appellant waived these issues by failing to provide citations to the record in the argument section of his brief. See Tenn. Ct. Crim. App. R. 10(b). However, our review of the appellant's brief shows that he cited to the record sufficiently enough to preserve the issues.

### 1. Testimony about the Appellant's Character

The appellant argues that "the trial court abused its discretion when it allowed the State to improperly elicit testimony about [the appellant's] character," specifically asserting that the appellant did not "open the door" to such testimony. See Tenn. R. Evid. 401(a). In response, the State contends that the testimony was properly admitted in response to statements made during defense counsel's direct examination of Dr. Solovey and Sharp.

During the presentation of the defense's proof, Dr. Solovey testified on direct examination that the appellant's ability to handle stressful situations was weak and that he was "not very internally cohesive." Accordingly, when the appellant was confronted by stressful situations, especially when he had consumed alcohol, he would likely respond in a panicked and disorganized manner. Dr. Solovey stated that the appellant was a follower "who would be part of a group rather than strike out or do things that would require individual decisions." Thereafter, on direct examination, Sharp testified that he had gone to school with the appellant and knew the appellant had attended special education classes. He testified about a specific instance when the appellant had an unprovoked panic attack during a camping trip. During the State's cross-examination of Sharp, the following colloquy occurred:

> [The State:] Okay. And [the appellant], having grown up with him, basically, you know, he's a pretty easy going fellow, wasn't he?
>
> [Sharp:] Yes
>
> [The State:] But if you made him mad, different story?

[Sharp:] Well, it all depends.

[The State:] Okay. But you've see that happen, haven't you?

[Sharp:] Yes.

[Defense Counsel:] Your Honor, I object to this. Only the defense can raise that subject.

[Trial Court:] Overruled.

At the motion for new trial hearing, defense counsel asserted that the appellant did not "open the door" to evidence of the appellant's character, and therefore, that the State should not have been allowed to ask Sharp how the appellant responded when angry. In response, the State cited the testimonies of Dr. Solovey and Sharp regarding the appellant's responses to stressful situations and his emotional problems. The State maintained that the foregoing question was asked to rebut the defense's proof "that . . . because of some medical condition . . . he responded a certain way" by demonstrating that "he was like anybody else when you made him mad." The trial court summarily overruled the appellant's motion for new trial.

Our supreme court has stated that, generally, "questions concerning the admissibility of evidence rest within the sound discretion of the trial court, and this Court will not interfere in the absence of abuse appearing on the face of the record." Pylant v. State, 263 S.W.3d 854, 870, 871 n.26 (Tenn. 2008) (citing State v. Dotson, 254 S.W.3d 378, 392 (Tenn. 2008); State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997); State v. Van Tran, 864 S.W.2d 465, 477 (Tenn. 1993); State v. Harris, 839 S.W.2d 54, 73 (Tenn. 1992)). The trial court's discretion in determining the admissibility of evidence is generally circumscribed by the Tennessee Rules of Evidence.

Ordinarily, "[e]vidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity with the character or trait on a particular occasion." Tenn. R. Evid. 404(a); see also Tenn. R. Evid. 404(b). Specifically, Rule 404(a) provides:

> [E]vidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity with the character or trait on a particular occasion, except:
>
> (1) . . . evidence of a pertinent character trait offered by

an accused or by the prosecution to rebut the same . . . .

Tenn. R. Evid. 404(a)(1).

Rule 404(a)(1) embodies a very important exception to the general bar on the admissibility of character evidence of the accused. Neil P. Cohen et al. Tennessee Law of Evidence §4.04[4][a] (LEXIS publishing, 6th ed. 2011). An accused may open the door to otherwise inadmissible character evidence "by raising the subject of that evidence at trial." State v. Gomez, 367 S.W.3d 237, 246 (Tenn. 2012). Our supreme court has explained that "[w]hen a party raises a subject at trial, the party 'expand[s] the realm of relevance,' and the opposing party may be permitted to present evidence on that subject." Id. (quoting 21 Charles Alan Wright et al. Federal Practice & Procedure Evidence § 5039.1 (2d ed. 1987)). In sum, "'opening the door' is an equitable principle that permits a party to respond to an act of another party by introducing otherwise inadmissible evidence." Id.

In the instant case, the testimony of Dr. Solovey and Sharp concerned the appellant's level of mental functioning and his ability to cope with stressful situations. The defense presented this testimony to establish the appellant's mens rea at the time of the charged offense. However, as the appellant asserts, the witnesses did not address the appellant's "character for peacefulness" on direct examination, although on cross-examination, the witnesses testified that the appellant was "easy-going." Accordingly, we conclude that the appellant did not "open the door" to the contested testimony.

Nevertheless, our supreme court has explained that "[w]here an error is not of a constitutional variety, Tennessee law places the burden on the defendant who is seeking to invalidate his or her conviction to demonstrate that the error 'more probably than not affected the judgment or would result in prejudice to the judicial process.'" State v. Rodriguez, 254 S.W.3d 361, 371 (Tenn. 2008) (quoting Tenn. R. App. P. 36(b)). Sharp's testimony reflected that the appellant's reaction to situations when he was angry "depend[ed]" on the factors involved. Thus, his testimony was, at most, minimally prejudicial to the appellant. Therefore, we conclude that although the trial court erred by not sustaining the appellant's objection to the State's question, the error was harmless. See Tenn. R. App. P. 36(b).

2. Testimony about Co-Defendants' Prior Acts

The appellant contends that the trial court violated his right to present a defense by refusing to allow him to introduce proof of his co-defendants' prior violent acts to establish that the appellant "panicked and acted as he did" because he was afraid of his co-defendants, who were "two very dangerous men." In response, the State contends that the evidence was not relevant because the appellant failed to lay a foundation for the admission of this

-13-

evidence to establish "that he acted in self-defense or that he was acting under duress based on his fear of the two co-defendants."

Prior to trial, the appellant filed a motion in limine requesting permission to introduce evidence of Preston and Lonnie, Jr.'s prior acts of violence. Specifically, the motion alleged the following:

> July 28, 2000- officers responded to a call and found Preston Parker swinging a club at his father. When one of the officers told Mr. Parker to drop the club, he responded by telling the officer that he was going to kill him.
>
> May 31, 2003- Mr. Parker assaulted Joshua Ferguson at the Hardee's Restaurant located in Pikeville, Tennessee.
>
> October 30, 2003- Preston Parker jumped Newell Freeman causing bruises and scratches over Mr. Freeman's head and bruises to his ribs where Mr. Parker had kicked him.
>
> September 14, 2005- Mr. Parker and Lonnie Angel, Jr. shot into the home of Tom Angel at his home . . . .

At the hearing on the motion, defense counsel explained that the proof should be admissible to prove that the co-defendants were "a couple of tush hogs . . . [who will] beat you up, they'll beat you up bad." Defense counsel said that the evidence of the prior bad acts would explain the appellant's "apprehension or fear," which led him to act as he did after witnessing his co-defendants attack the victim. The State argued that the appellant had not raised self-defense or duress and had not established that the appellant hit the victim because of threats. The trial court agreed with the State but held that if the appellant laid a foundation establishing that he joined in the assault as a result of threats from Parker or Lonnie, Jr., the evidence might be admissible.

A criminal defendant has a right to present a defense that is guaranteed by the Sixth Amendment and the Due Process Clause of the Fourteenth Amendment of the United States Constitution. State v. Brown, 29 S.W.3d 427, 432 (Tenn. 2000). However, in many situations, the appellant's due process right "'must yield to other legitimate interests in the criminal trial process.'" Id. at 432 (quoting Chambers v. Mississippi, 410 U.S. 284, 295 & 302 (1973)). To this end, "[s]o long as the rules of procedure and evidence are not applied arbitrarily or disproportionately to defeat the purposes they are designed to serve, these rules do not violate a defendant's right to present a defense." State v. Flood, 219 S.W.3d 307, 316

-14-

(Tenn. 2007). To determine whether a defendant's due process right to present a defense has been violated by the exclusion of evidence, we must consider:

> (1) Whether the excluded evidence is critical to the defense;
>
> (2) Whether the evidence bears sufficient indicia of reliability; and
>
> (3) Whether the interest supporting exclusion of the evidence is substantially important.

Id. at 316 (citing Brown, 29 S.W.3d at 434-35; State v. Rice, 184 S.W.3d 646, 673 (Tenn. 2006); State v. Rogers, 188 S.W.3d 593, 614 (Tenn. 2006)).

In considering a similar issue, this court recently stated, "Negative character evidence offered against someone other than a criminal defendant is still subject to the remaining rules of evidence. The general default rule that '[a]ll relevant evidence is admissible,' established by Rule 402, still applies, as does its proviso that '[e]vidence which is not relevant is not admissible.'" State v. Lamont Johnson, No. W2012-01271-CCA-R3-CD, 2013 WL 2404057, at *5 (Tenn. Crim. App. at Jackson, May 30, 2013), application for perm. to appeal filed (Tenn. July 24, 2013). In other words, the right to present a defense "does not mean that a defendant has a right to present irrelevant evidence." State v. Sheline, 955 S.W.2d 42, 47 (Tenn. 1997).

We agree with the State that the appellant failed to lay any foundation for the admission of the evidence of his co-defendants' violent history. During opening statements, defense counsel contended that the appellant was a mildly mentally retarded individual who stepped into a "charged situation." Counsel did not allege that the appellant was threatened or coerced into beating the victim. Moreover, in closing argument, defense counsel asserted that the appellant, who had limited intelligence, walked into a charged situation and made a bad decision but that he did not do anything to contribute to the victim's death.

The appellant contends that the foundation was established by Eller's testimony that he had to obtain permission to leave, Sherman's testimony that Watson had a gun, Preston's testimony that Lonnie, Jr., had a gun, and the appellant's statement to Agent Wilson that he did not "ask the others to stop . . . because they might have knocked the hell out of him." However, none of the witnesses testified that the appellant beat the victim because his co-defendants threatened or coerced him. Indeed, in the appellant's statement to the police he said that he struck the victim because the appellant was drunk and because he had been told that the victim was "sorry as sh[*]t." Accordingly, we conclude that the trial court did not

-15-

abuse its discretion in excluding the evidence of Preston and Lonnie, Jr.'s prior violent acts.

## B. Sufficiency of the Evidence

The appellant contends that the evidence is insufficient to support the conviction because it fails to show that he acted knowingly. On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

The guilt of a defendant, including any fact required to be proved, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. See State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Even though convictions may be established by different forms of evidence, the standard of review for the sufficiency of that evidence is the same whether the conviction is based upon direct or circumstantial evidence. See State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011).

Second degree murder is the knowing killing of a victim. See Tenn. Code Ann. § 39-13-210(a)(1). Our supreme court has determined that second degree murder is a result of conduct offense. See State v. Ducker, 27 S.W.3d 889, 896 (Tenn. 2000). Accordingly, "[a] person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(b). Moreover, "[o]ur jurisprudence recognizes that the mental state, a necessary factor of almost all our criminal statutes, is most often proven by circumstantial evidence, from which the trier of fact makes inferences from the attendant circumstances and from which that body weighs the circumstantial evidence." State v. Jeffrey Antwon Burns, No. M1999-01830-CCA-R3-CD, 2000 WL 1520261, at *3 (Tenn. Crim. App. at Nashville, Oct. 13, 2000). A criminal attempt occurs when a person acting with the kind of culpability otherwise required for the offense:

(1) Intentionally engages in action or causes a result that would constitute an offense if the circumstances surrounding the conduct were as the person believes them to be;

(2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or

(3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

Tenn. Code Ann. § 39-12-101(a)(1)-(3).

Taken in the light most favorable to the State, the proof at trial revealed that during a cookout at Lonnie, Jr.'s barn, Preston accused the victim of killing Clyde Angel, who was Lonnie, Jr.'s uncle and a friend of the appellant. The victim did not deny the accusation and approached Preston. Preston knocked the victim to the ground and, once he was down, repeatedly kicked him in the head. After the appellant and Sherman arrived at the barn, Watson told Preston that the victim was trying to get up. Preston kicked the victim in the head and hit him to render him unconscious. When Preston told the appellant that the victim had killed Clyde, the appellant "flip[ped] out" and joined the attack on the victim. The appellant hit the wounded and helpless victim with a bottle and swung a post hole driver at him. The appellant also kicked the victim in the stomach and hit him in the head with a rubber boot. Lonnie, Jr., and Watson also kicked the victim in the head. In his statement, the appellant acknowledged that he kicked the victim because the appellant was drunk and had been told the victim "was sorry as sh[*]t." Lonnie, Sr., heard the appellant say, "'Let's do [the victim] in.'" Testing revealed that the victim's blood was on the boot, the post hole driver, the bottle, and the bumper of Lonnie, Jr.'s truck, which was in the barn at the time of the assault. The medical examiner stated that the victim died from blunt force trauma to the head, explaining that no one blow killed the victim but that his death was caused by the cumulative effect of all of the blows. The medical examiner asserted that the victim's injuries could have been caused by boots, a beer bottle, or a metal pipe or that the injuries could have been caused by none of them. None of the witnesses saw anyone instruct or threaten the appellant to hit or kick the victim.

On appeal, the appellant contends that the jury should have accredited his proof that, due to his mental capacity and problems, he could not form the necessary mens rea for the

-17-

crime. He further contends that he did not strike a blow that contributed to the victim's death. The jury, not this court, determines the credibility of the witnesses and the weight and value to be given their testimony. The jurors, as they were free to do, chose to accredit the evidence presented by the State. See State v. Millsaps, 30 S.W.3d 364, 368 (Tenn. Crim. App. 2000). We conclude that the foregoing proof was sufficient to sustain the appellant's conviction for attempted second degree murder.

## C. Sentencing

As his final issue, the appellant contends that the trial court "abused its discretion when it improperly concluded that the [victim] was particularly vulnerable and the eleven (11) year sentence which it subsequently imposed was unreasonable." The State maintains that the trial court properly sentenced the appellant. We agree with the State.

The appellant was convicted of attempted second degree murder, a Class B felony. See Tenn. Code Ann. §§ 39-12-107(a); 39-13-210(c). Therefore, as a Range I, standard offender, he was subject to a sentence between 8 and 12 years. Tenn. Code Ann. § 40-35-112(a)(2).

At the sentencing hearing, Ola Sharp, a minister, testified that he had known the appellant for the appellant's entire life. After the appellant's arrest, the appellant repeatedly asked the church to pray for him and the victim's family. The minister thought the appellant was remorseful.

The trial court applied enhancement factor (1), that the appellant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range; enhancement factor (4), that a victim of the offense was particularly vulnerable because of physical disability; and enhancement factor (9), that the appellant possessed or employed a deadly weapon during the commission of the offense. Tenn. Code Ann. § 40-35-114 (1),(4), (9). The trial court applied mitigating factor (3), that substantial grounds exist tending to excuse or justify the appellant's criminal conduct; mitigating factor (8), that the appellant was suffering from a mental or physical condition that significantly reduced his culpability for the offense; mitigating factor (9), that the appellant assisted the authorities in uncovering offenses committed by other persons or in detecting or apprehending other persons who had committed the offenses; mitigating factor (11), that the appellant committed the offense under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated the criminal conduct; and mitigating factor (12), that the appellant acted under duress or under the domination of another person, even though the duress or the domination of another person is not sufficient to constitute a defense to the crime. Tenn. Code Ann. § 40-35-113 (3),(8), (9),(11), (12). The trial court found that the

enhancement factors significantly outweighed the mitigating factors and sentenced the appellant to eleven years.

Previously, appellate review of the length, range, or manner of service of a sentence was de novo with a presumption of correctness. See Tenn. Code Ann. § 40-35-401(d). However, our supreme court recently announced that "sentences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012). Our supreme court has further explicitly stated that "the abuse of discretion standard, accompanied by a presumption of reasonableness, applies to within-range sentences that reflect a decision based upon the purposes and principles of sentencing, including the questions related to probation or any other alternative sentence." State v. Caudle, 388 S.W.3d 273, 278-79 (Tenn. 2012). In conducting its review, this court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the appellant in his own behalf; and (8) the potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-102, -103, -210; see also Bise, 380 S.W.3d at 697-98. The burden is on the appellant to demonstrate the impropriety of his sentence. See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c).

Although the trial court should consider enhancement and mitigating factors, the statutory enhancement factors are advisory only. See Tenn. Code Ann. § 40-35-114; see also Bise, 380 S.W.3d at 701; State v. Carter, 254 S.W.3d 335, 343 (Tenn. 2008). Our supreme court has stated that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." Carter, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" Id. at 343. "[A]ppellate courts are therefore left with a narrower set of circumstances in which they might find that a trial court has abused its discretion in setting the length of a defendant's sentence." Id. at 345-46. "[They are] bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." Id. at 346.

The appellant does not challenge the application of enhancement factors (1) and (9), and we agree that those enhancement factors are applicable. The presentence report reflects that the appellant has previously been convicted of driving under the influence, two counts of possession of less than one-half of an ounce of a schedule VI drug, possession of 10 pounds to 70 pounds of a schedule VI drug, simple assault, and possession of a weapon with the intent to go armed. Moreover, the proof at trial revealed that the appellant struck the victim with a bottle and a post hole driver, which are deadly weapons. See Tenn. Code Ann. § 39-11-106(a)(5)(B) (providing that a "deadly weapon" is "[a]nything that in the manner of its use or intended use is capable of causing death or serious bodily injury").

The appellant challenges the trial court's application of enhancement factor (4), that the victim was particularly vulnerable because of physical disability. Tenn. Code Ann. § 40-35-114 (4). He maintains that "the State bears the burden of showing that [the] vulnerability was, in fact, a factor in the [appellant's] actions"; in other words, he essentially argues that the factor was inapplicable when the appellant did not commit the crime because of the victim's vulnerability.

Our supreme court has explained that "[a] vulnerability that is wholly irrelevant to the crime is not 'appropriate for the offense.'" State v. Lewis, 44 S.W.3d 501, 505 (Tenn. 2001). However, this requirement does not "place an additional burden on the State to prove that a defendant actually evaluated the vulnerabilities of his victims and then acted to capitalize on those perceived vulnerabilities." Id. This enhancement factor is appropriate when a victim's vulnerability "had some bearing on, or some logical connection to, 'an inability to resist the crime, summon help, or testify at a later date.'" Id. (quoting State v. Poole, 945 S.W.2d 93, 96 (Tenn. 1997)). The proof at trial reflected that the victim was lying on the ground, unarmed, severely wounded, and helpless when the appellant began to strike him. The victim was not able to fight back or summon help. Further, the witnesses asserted that the victim

-20-

was not a threat to anyone. Accordingly, we conclude that the trial court did not err in applying this enhancement factor.

The appellant also contends that although the eleven-year sentence was within the appropriate range, the sentence was unreasonable. However, as we have repeatedly stated, the weighing of mitigating and enhancing factors is left to the trial court's sound discretion. Carter, 254 S.W.3d at 345. Accordingly, "[s]o long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed by the trial court within the appropriate range should be upheld." Bise, 380 S.W.3d at 706. We conclude that the trial court did not abuse its discretion in imposing a sentence of eleven years for the appellant's attempted second degree murder conviction.

### III. Conclusion

In sum, we conclude that the trial court erred in allowing the State to question a witness about the appellant's character but that the error was harmless. We also conclude that the trial court did not err in excluding evidence of the co-defendants' propensity for violence, that the evidence is sufficient to sustain the appellant's conviction for attempted second degree murder, and that the trial court properly sentenced the appellant. Therefore, we affirm the judgment of the trial court.

_____
NORMA McGEE OGLE, JUDGE